FRANK C. GIBB and LORRAINE E. GIBB, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent.
Gibb v. Commissioner
Docket Nos. 5569-70 "SC" 8545-71.
United States Tax Court
T.C. Memo 1973-161; 1973 Tax Ct. Memo LEXIS 124; 32 T.C.M. (CCH) 784; T.C.M. (RIA) 73161; July 24, 1973, Filed J. C. Cizmadia V, for the petitioners. Jesse T. Mountjoy, for the respondent. TANNENWALD
MEMORANDUM FINDINGS OF FACT AND OPINION TANNENWALD, Judge: In these consolidated cases, respondent determined the following deficiencies in petitioners' income tax: 2 Docket No.
Year
Deficiency 5569-70 "SC"
1967
$ 921.69
8545-71
1968
1,022.22
1969
277.20
The sole question presented is whether payments of United States Public Health Service funds by Ohio State University to Lorraine E. Gibb (hereinafter referred to as "petitioner") as a postdoctoral research associate in the years in question are excludable from income under section 117(a). [1]
*125 FINDINGS OF FACT Some of the facts are stipulated and are so found. Petitioners are husband and wife and resided in Columbus, Ohio, at the time their petitions herein were filed. Joint Federal income tax returns were filed with the district director of internal revenue, Cincinnati, Ohio. Frank C. Gibb is a party herein solely because he filed joint returns with petitioner for 1967, 1968, and 1969. 3 In March 1966, petitioner received her Ph.D. degree in physiological chemistry from Ohio State University. Her Ph.D. matriculation consisted of four years of research and laboratory work, investigating primarily the effects of various substances on energy generation in rats, for which she received an average stipend of $234 a month for eleven months out of each year. Her Ph.D. thesis was entitled "The Effect of Deficiencies of Essential Fatty Acids in Rats." The Ohio State University Research Foundation (Research Foundation) is a non-profit educational institution, independent of Ohio State University, but with the express purpose of aiding in the development and administration of research activities and projects undertaken on behalf of the University in the pursuit of *126 that institution's academic objectives. It operates as part of the administrative structure of the University and serves as a conduit through which research contracts and grant funds are administered for the benefit of professors and others engaged in research. The Institute for Research in Vision was established at the Ohio State University in 1948 4 and is an interdepartmental unit of the University devoted to research in various phases of the process of seeing. The Institute conducts basic research of the anatomy, biochemistry, physiology, and psychophysics of vision which provides understanding for methods of diagnosis and treatment of blinding eye diseases. The administrative and fiscal aspects of the Institute are handled by and through the Research Foundation. During the years in question, the Institute was engaged in Project 1575 (Chemical Studies of the Stimulated Retina) pursuant to research contracts between the United States Public Health Service and the Research Foundation. The application of the Research Foundation for the research grant covered by Project 1575 for the period January 1 to December 31, 1967 [2] was dated May 25, 1966 and listed petitioner *127 as a "Research Associate," indicating that petitioner as a "Research Associate," indicating that petitioner would devote 100 percent of her time to the project and specifying that she would receive a "salary" of $9,600 and "fringe benefits" of $643. The application was approved, and on January 11, 1967, a "Notice of Grant Awarded" was issued "under Authority of Federal 5 Statutes and Regulations, and Public Health Service Policy Statements applicable to Research Grant." In December 1967, an application was filed for renewal of the grant for Project 1575 for the three-year period 1968 through 1971. Petitioner was again listed as a "Research Associate" in the application on the same basis as previously. The application was approved for 1968 and again for 1969 [3] and a similar "Notice of Grant Awarded" was issued for each year. *128 The Research Foundation was required to furnish progress reports to the United States Public Health Service and also to make the results of the research available to the scientific public. Under sponsored research contracts, the Research Foundation has no authority to administer or distribute research grant proceeds without services being performed in return or work being done. 6 Payments of research funds are made to the Research Foundation by the sponsoring Federal agencies. The research funds are then categorized according to the type of expenditures involved in the research project. That part of the research grant representing wages and salaries is transferred by the Research Foundation to its rotary account maintained by the University payroll office. All other funds from a research grant are maintained in the Research Foundation's own bank account. In the records of the Research Foundation, the payments made to research associates are not referred to as fellowships but rather as salary and wages. All persons associated with sponsored research projects administered by the Research Foundation are University employees for the purpose of administration, and not *129 Research Foundation employees. Ohio State University uses two types of appointments for persons receiving money for work performed. Regular appointments are given to most persons engaged in any classification, academic 7 or non-academic in nature, including those paid from grants administered by the Research Foundation, when such appointments are essentially permanent in nature. The regular appointments of personnel paid from grants are co-extensive with the duration of each grant renewal, usually for periods of one year. Special appointments are usually given when the appointment is temporary in nature or unusual circumstances render a regular appointment inappropriate. Those persons who receive regular appointments participate in University retirement and medical programs, taxes are withheld from money they receive under such appointment, and they are entitled to vacation and sick leave. Special appointees may or may not be subject to withholding, depending on hours worked or prior arrangement with the district director of internal revenue, no insurance premiums are paid for them, and they participate in no retirement program. Sick and vacation leave are left to the discretion *130 of the special appointee's supervisor. Persons appointed as graduate or post-graduate fellows by the board of trustees of the Ohio State University receive appointments and 8 special withholding treatment. Payments made to persons appointed as research assistants and associates usually are classified by the University as "salaries and wages." On May 1, 1966, petitioner was appointed to a non-faculty research associate position by the Research Foundation for research at the Institute on Project 1575. She received $700 per month from funds paid to her by the Graduate School at Ohio State University from the day of her appointment until December 31, 1966. From January 1967 until October 1969, petitioner worked as a research associate for the Research Foundation on Project 1575. She received a monthly salary of $814, which was increased to $854 effective July 1, 1968. She was paid by funds received by the Research Foundation from the Public Health Service with respect to Project 1575. On January 11, 1967, and again on August 22, 1969, petitioner signed an agreement with the Research Foundation entitled "Research Rules and Regulations, Research Foundation Projects," under *131 which she agreed: 9 (a) to observe University rules as to vacation, sick leave, and the like; (b) to give 30 days advance written notice of her intention to quit the project to which she was assigned; (c) to consult with her supervisor and keep him informed regarding her work; (d) to keep systematic notes properly verified and to maintain and preserve all data notes concerning her work and to deliver the same to the Research Foundation; (e) not to retain copies of such data or publish or disclose the same without the consent of the Research Foundation; (f) upon request, to prepare and submit interim and final reports; (g) to assign to the Research Foundation all her right, title, and interest in any inventions, patents, and discoveries; and (h) to observe security requirements regarding classified information. Petitioner's research on Project 1575 consisted of investigating various aspects of the biochemistry 10 of vision. More specifically, petitioner's research included conducting experiments and collecting data on the effect of detergents on the regeneration of the bovine retinal outer segments. Her research constituted an integral part of Project 1575 *132 and was independent of research conducted by other Project 1575 personnel. In September 1969, petitioner submitted to the supervisor of Project 1575 a manuscript entitled "The Effect of Detergents on Regeneration of Bovine Retinal Outer Segments." The manuscript has not been published. In 1967, 1968, and 1969, the University payroll office withheld amounts for Federal income taxes from the amounts paid to petitioner. Petitioner also participated in the University Employees Major Medical and Group Life Insurance Program and the State of Ohio's Public Employees Retirement System. In her tax returns for the years 1967, 1968, and for three months in 1969, petitioner excluded $300 for each month in which she received funds from Project 1575 on the ground that she was the recipient of a postdoctoral fellowship. 11 OPINION The test of excludibility from gross income under section 117 of amounts received as a "scholarship" or "fellowship" is whether they constitute "relatively disinterested, "no strings' educational grants, with no requirement of any substantial quid pro quo from the recipients." . The ultimate question *133 is whether the raison d'etre for the payment is work or study. See , affirmed per curiam, (C.A. 4, 1967). The question is one of fact. ; . The decided cases cover the full spectrum, with all its shadings, of the elements to be taken into account in determining whether a payment should be considered a fellowship or compensation for services. We see no need to articulate all the elements revealed by the record herein which cause us to conclude that respondent's determination should be sustained. 12 We simply note in passing that among these elements are the following: [4]
(1) Petitioner was expected to devote her full time to the project. . (2) The services of petitioner were directly related to the fulfillment *134 of a contractual commitment to a specifically sponsored project. . (3) Petitioner submitted a manuscript which was required, along with any other results of her research, to be made available to the scientific public. Thus, the purposes of the United States Public Health Service were directly served by her activities. Cf. ; . (4) The amount paid petitioner was unusually large compared with the amount normally awarded for fellowships. . Moreover, there is no evidence indicating the 13 amount was based on petitioner's need rather than as a measure of the value of her services. . (5) Ohio State University treated petitioner as a "regular employee," with all the fringe benefits normally associated with employment rather than scholarship. ; , is clearly distinguishable. The evidence in that case established *135 that the taxpayer was not in fact required to perform any services for the benefit of the University or the Department of Health, Education and Welfare, which provided the funds. All of the elements which pointed in the direction of compensation were dissipated by the overriding fact that the taxpayer's "efforts were directed entirely to coursework, as a student, reading, and some writing, the products of which were published in professional magazines." See . Petitioner seeks to avoid the impact of the decided cases by contending that her purpose was 14 to extend her learning. But such a purpose, even if actually implemented, cannot convert compensation into a nontaxable fellowship. See . As we said in , "the fact that [the taxpayer] was able to kill two birds with one stone - in the sense that he could derive both direct educational and financial benefit - does not mean that he was being paid to study rather than to work." Granted that there is no single mold in which to fit a "scholarship" or a "fellowship," we think it clear that petitioner *136 was being paid to work and not to study. [5] Accordingly, Decisions will be entered for the respondent. Footnotes
1. All Code references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue. ↩
2. Project 1575 was originally instituted in 1965. ↩
3. The approvals were dated May 1, 1968 and May 1, 1969 and covered the periods June 1, 1968 through May 31, 1969 and June 1, 1969 through May 31, 1970, whereas the previous approval covered the calendar year 1967. There is nothing in the record to indicate that a different arrangement obtained during the period January 1, 1968 through May 31, 1968. ↩
4. In enumerating certain elements, we do not mean to imply that the presence or absence of any one of them would be determinative or that there are not other elements which would further support our conclusion. ↩
5. See . ↩